Steven R. STEIN, Ph.D., Petitioner-Appellant,†

v.

STATE of Wisconsin PSYCHOLOGY EXAMINING BOARD
and Department of Regulation and Licensing,
Respondents-Respondents.

Court of Appeals

*No. 02–2726. Submitted on briefs March 10, 2003.—Decided
June 5, 2003.*

2003 WI App 147

(Also reported in 668 N.W.2d 112.)

† Petition to review denied 8-13-03.

782

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Kevin F. Milliken* and *Kristine A. Long* of *Hurley, Burish & Milliken, S.C.*, Madison.

On behalf of the respondents-respondents, the cause was submitted on the brief of *Maureen McGlynn Flanagan*, asst. attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Vergeront, P.J., Dykman and Roggensack, JJ.

¶ 1. VERGERONT, P.J. Steven Stein, Ph.D., appeals the circuit court's order affirming the decision of the Wisconsin Psychology Examining Board that Stein had sexual intimacies with a client in violation of Wis.

ADMIN. CODE §§ PSY 3.02(2) and (15) (1986).[1] The Board ordered that Stein's license to practice psychology be suspended for one year. Stein contends: (1) the doctrine of laches precludes the Board from prosecuting the action against him; (2) the constitutional guarantee of procedural due process precludes the Board from prosecuting the action because of the passage of time since the events giving rise to the complaint; (3) the Board erred in admitting incompetent and speculative testimony; and (4) the Board's finding that Stein had a sexual relationship with his client was not supported by substantial evidence.

¶ 2. We conclude: (1) the doctrine of laches does not apply because this proceeding is brought by the State in its sovereign capacity to protect a public right; (2) Stein's right to procedural due process was not violated because he has not shown that the passage of time prejudiced his ability to defend himself; (3) the Board did not err in admitting evidence; and (4) the Board's finding of a sexual relationship was supported by substantial evidence. Accordingly, we affirm.

---

[1] WISCONSIN ADMIN. CODE § 3.02 (1986) provided in part:

**Professional conduct.** The practice of psychology is complex and varied, and therefore allows for a broad range of professional conduct. The following acts constitute unprofessional conduct by applicants for licensure and licensees of the board and are prohibited. Complaints regarding these acts shall be investigated and may lead to disciplinary proceedings.

. . . .

(2) Practicing of psychology in a grossly negligent manner.

. . . .

(15) Indulging in sexual intimacies with clients.

## BACKGROUND

¶ 3. The complainant, Susan L., received psychotherapy services from Stein from 1984 until 1986. In December 1996, she contacted the American Psychology Association to complain that Stein had engaged in sexual misconduct with her. The association told her that it had a ten-year limitation on investigating claims of sexual misconduct by psychologists and therefore it would not investigate her claim. Susan then contacted the Wisconsin Department of Regulation and Licensing in approximately December 1996, and filed a written complaint in January 1997. The Department issued a formal complaint against Stein in February 2000.

¶ 4. On Stein's motion, the administrative law judge issued a proposed decision dismissing the relevant counts of the complaint on the ground of laches. The Board rejected that proposed decision, concluding laches did not apply in disciplinary proceedings against licensed professionals. In the alternative, the Board concluded that, if the defense of laches were available, it would probably not apply based on the facts of this case. The Board also concluded that the delay did not violate Stein's constitutional right to due process because he had not shown prejudice. Accordingly, the Board remanded the matter to the ALJ, who conducted an evidentiary hearing.

¶ 5. At the evidentiary hearing, Susan testified that she had a sexual encounter with Stein in his office after a joint therapy session with her husband. She also described meetings that took place away from Stein's office after her therapy sessions with Stein had terminated, at least one of which included sexual intimacies. Stein denied he had a sexual relationship with Susan, although he acknowledged he had feelings toward her

and that he saw her socially after her therapy sessions with him ended. According to Stein, his therapy sessions with Susan ended after she bared her breasts to him during a session.

¶ 6. The ALJ made the following findings of fact relevant to this appeal, which the Board adopted:

> 2. In October of 1983, [Susan] began receiving psychotherapy from Nancy Feingold, M.S.S.W., ... [t]he therapy sessions continued intermittently until March of 1994.[2]
>
> 3. Steven R. Stein, Ph.D., began providing [Susan] with individual psychotherapy in April of 1984. The therapy sessions ended in the second half of 1986, but the two continued to see one another after that point.
>
> 4. In the second half of 1986, but prior to her therapy ending, [Susan] and her husband had a joint therapy session with Dr. Stein. Following that session, her husband left the office and [Susan] remained to speak further with Dr. Stein. Dr. Stein and [Susan] then engaged in a sexual encounter during which time he held and kissed her, and fondled her breasts and genitalia.
>
> 5. After that encounter, Dr. Stein terminated his therapeutic relationship with [Susan].
>
> 6. In December of 1986, [Susan] resumed therapy with Ms. Feingold. In March 1987, Dr. Stein was present during a therapy session with [Susan] and Ms. Feingold. During that session, Dr. Stein did not deny having had a sexual relationship with [Susan].

(Footnote added.)

---

[2] The parties apparently agree that Susan's therapy with Feingold concluded in April 1987, but this discrepancy is not material to this appeal.

¶ 7.　The Board concluded that, based on finding No. 4, Stein had sexual intimacies with a client in violation of Wis. Admin. Code § PSY 3.02(15) (1986). It also concluded that, by engaging in sexual intimacies with the spouse of a client to whom he was providing individual psychotherapy, Stein practiced psychology in a grossly negligent manner in violation of Wis. Admin. Code § PSY 3.02(2) (1986). The Board ordered that Stein's license to practice psychology be suspended for one year.

¶ 8.　Stein sought judicial review pursuant to Wis. Stat. ch. 227 and the circuit court affirmed. The court reviewed de novo the Board's decision on laches and due process and concluded that decision was correct. The court also concluded there was no erroneous exercise of discretion in admitting Feingold's testimony concerning the March 1987 therapy session and that findings Nos. 4 and 6 were supported by substantial evidence.

## DISCUSSION

■

¶ 9.　We review the decision of the Board, not that of the circuit court. *Gordon v. State Med. Examining Bd.*, 225 Wis. 2d 552, 556, 593 N.W.2d 481 (Ct. App. 1999).

*Laches*

■

¶ 10.　We first consider Stein's contention that the Board erred in deciding that the doctrine of laches was not available as a defense in this proceeding. Laches is an equitable doctrine that may bar an action if these requirements are met: (1) the plaintiff unreasonably delayed in commencing the action, (2) the defendant

lacked knowledge the plaintiff would assert the right on which the suit is based, and (3) the defendant is prejudiced by the delay. *Sawyer v. Midelfort*, 227 Wis. 2d 124, 159, 595 N.W.2d 423 (1999). The parties agree that whether the doctrine of laches may be raised as a defense in this proceeding presents a question of law, which we review de novo. *See DOR v. Hogan*, 198 Wis. 2d 792, 802, 543 N.W.2d 825 (Ct. App. 1995) (application of legal principles to the facts of a case presents a question of law, which we review de novo).

¶ 11. The dispute over whether the defense of laches is available in this action arises from the parties' differing readings of *State v. Josefsberg*, 275 Wis. 142, 81 N.W.2d 735 (1957). In *Josefsberg*, the court considered whether the defendant in a medical license revocation proceeding could assert the defense of laches. The ground alleged for revocation was fraud in obtaining the license. *Id.* at 144–45. The court reviewed cases from other states, some of which held that laches may apply in a medical license revocation proceeding based on fraud, and some of which held that it may not. *Id.* at 153–54. The court then quoted from two treatises, both of which stated that laches is not available against the government when the government is acting in a sovereign capacity, which, as one treatise explained, occurs when the government brings a suit "to enforce a public right or to protect a public interest . . . ." *Id.* at 154–55 (citations omitted). The court concluded that, because the license revocation proceeding was an action "brought by the state in its sovereign capacity to protect a public right, we are constrained to hold that the doctrine of laches was not applicable to the situation litigated therein." *Id.* at 155.

¶ 12. Stein contends that *Josefsberg* stands for the proposition that laches is not available when fraud

in obtaining a professional license is the basis for the proceeding, while the Board and the trial court read *Josefsberg* to preclude the defense of laches in any proceeding brought by the state in its sovereign capacity to protect a public right. We agree with the latter reading of *Josefsberg*. It is true that the cases the *Josefsberg* court mentioned concerned fraud as a ground for license revocation—both those allowing laches and those precluding it—but the treatises the court cited were not limited to those facts. Most importantly, the court's conclusion was not so limited, but was stated in the broad terms of the treatises quoted.

¶ 13. The broader reading of *Josefsberg* is confirmed by *State v. Chippewa Cable Co.*, 21 Wis. 2d 598, 124 N.W.2d 616 (1963)—a case in which the state proceeded against a company to compel it to cease violating a statute regulating the height of towers. The court had this to say about the defendant's assertion of laches: "We have held that the doctrine of laches is not applicable to an action by the state to protect a public right," and it cited to *Josefsberg. Chippewa Cable Co.*, 21 Wis. 2d at 608 n.16.

¶ 14. More recently, without citing to *Josefsberg*, the supreme court has refused to permit laches as a bar to attorney disciplinary proceedings. In *In re Disciplinary Proceedings Against Eisenberg*, 144 Wis. 2d 284, 294, 423 N.W.2d 867 (1988), the court stated:

> [W]e are not persuaded that the doctrine of laches does or should bar a proceeding the issue of which is an attorney's fitness to practice law as demonstrated by his professional conduct. However, a substantial lapse of time between professional misconduct and the initiation of disciplinary proceedings based thereon is a factor to be considered in the determination of appropriate discipline to be imposed, as it may affect the ends

> lawyer discipline is to achieve: protection of the public,
> the courts and the legal profession, rehabilitation of the
> attorney and deterrence of like misconduct by others.

The supreme court subsequently quoted this statement in *In re Disciplinary Proceedings Against Charlton*, 174 Wis. 2d 844, 498 N.W.2d 380 (1993), again refusing to permit laches to be raised as a defense in an attorney disciplinary proceeding.

¶ 15. We conclude that under *Josefsberg* laches is not available in any proceeding brought by the State in its sovereign capacity to protect a public right, and we see no indication in later cases that the supreme court has retreated from that holding. We also conclude that this proceeding is one brought by the State in its sovereign capacity to protect a right of the public—the right to have licensed psychologists comply with the requirements of their licenses. Accordingly, we agree with the Board and the circuit court that the defense of laches is not available to Stein.

*Due Process*

¶ 16. We next consider whether the passage of time between the occurrence of the events that gave rise to the complaint and the hearing on the complaint violated Stein's right to procedural due process. The parties agree that because this proceeding affects Stein's license, which is necessary to engage in his profession, he is entitled to the procedural protections of the due process clause. *See Epstein v. Benson*, 2000 WI App 195, ¶ 25, 238 Wis. 2d 717, 618 N.W.2d 224. They disagree, however, on what legal standard we are to apply to determine if those rights were violated,

as well as on whether there was a violation given the facts of this case. These are questions of law, which we review de novo. *See State v. Keith*, 216 Wis. 2d 61, 69, 573 N.W. 888 (Ct. App. 1997).

¶ 17. Stein asserts that the proper legal standard is whether the passage of time between the events relevant to the complaint and the hearing on the complaint prejudiced him. His focus is primarily on Susan's delay in filing a complaint with the Department, although he points out that three more years passed before the Department issued a formal complaint and almost two more years until the hearing. He relies on the well-established proposition that procedural due process requires notice and the opportunity to be heard in a meaningful time and in a meaningful manner. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546–47 (1985). Stein's position is that he did not have a meaningful hearing because the passage of time prejudiced his ability to defend himself.

¶ 18. The State, in contrast, relies on criminal cases holding that prosecutorial delay in bringing charges does not violate a defendant's right to due process unless he or she shows both actual prejudice resulting from the delay and that the delay arises from an improper motive on the part of the prosecutor, such as gaining a tactical advantage over the accused. *See State v. Wilson*, 149 Wis. 2d 878, 903–05, 440 N.W.2d 534 (1989) (applying *United States v. Lovasco*, 431 U.S. 783 (1977)). According to the State, Stein has shown neither. According to Stein, he has shown actual prejudice and he need not show improper prosecutorial motive, which he does not assert exists.

792

¶ 19. We find it unnecessary to decide whether Stein must show improper prosecutorial motive, as well as actual prejudice, because we conclude he has not shown prejudice. We address each of his claims of prejudice in turn.

¶ 20. First, Stein contends that the passage of time prevented him from corroborating his version of events through the testimony of Dr. Anna Laird, who, he averred, was his personal therapist and with whom he discussed in 1986 "transference issues and feelings towards Susan which arose out of the doctor/patient relationship."[3] Stein did not call Laird as a witness, but her affidavit averred that she could not recall those discussions and that she had destroyed her patient records in the spring of 1999. The record shows that Stein learned of Susan's complaint long before then. In the Board's decision rejecting the ALJ's proposed decision on laches, it refers to an affidavit averring that Stein was informed of Susan's complaint within seven months after she filed it in January 1997. We are unable to locate that affidavit in the record, but the record does disclose that in June 1998 Stein took a polygraph test related to Susan's complaint. Stein does not dispute the assertion that he first learned of Susan's complaint in 1997, but instead argues that the Department did not initiate the action until February 2000, and before that date he had reason to believe the Department would not initiate an action because of the age of the allegations and the fact that he already had taken a polygraph test. He also argues there is no evidence he was involved with the destruction of Laird's notes. We agree there is not. However, the fact remains that, had Stein wished

---

[3] Stein's affidavit, as well as Laird's, were submitted in support of his motion for summary judgment based on laches.

to obtain Laird's notes, he had ample opportunity to do so before she destroyed them.

¶ 21. Second, Stein contends that he did not have the benefit of Feingold's confidential notes on her sessions with Susan, which were destroyed at the time she moved her office in late 1996 or early 1997. Feingold testified that Susan resumed therapy with her in December 1986, and told Feingold then of her sexual relationship with Stein. This prompted Feingold to maintain both a regular file of clinical notes and a confidential file, because Stein was practicing in the same clinic and Feingold did not want to compromise Susan's confidentiality in any way. The regular clinic notes from Susan's sessions were not destroyed and are part of the record. Feingold testified that she recalled the March 27, 1987 session, and she recalled the discussions with Susan about Stein leading up to that, as well as the reasons she created a confidential set of notes. There is no basis in the record for concluding that Feingold's confidential notes would have been less damaging to Stein than was her testimony.

¶ 22. Third, Stein contends that Susan's recollection had faded over the years and this deprived him of an alibi defense and lessened the impact of her testimony that he had a prominent appendectomy scar, which she could not recall even though she testified they had both fully disrobed. With respect to the findings adopted by the Board, the actual date of the sexual encounter described in finding No. 4 was not significant; what was significant was whether the sexual encounter occurred while Susan was Stein's client. Since there was evidence that Stein did have joint sessions with Susan and her husband, and since her account was that the sexual encounter occurred in his office after a joint therapy session, we do not

794

understand how Susan's ability to recall that specific date would aid Stein in presenting his defense, which was that no such sexual encounter in his office occurred regardless of the date. Similarly, the conflict in testimony over the meetings outside the office were not over whether they occurred, but over what happened during those meetings. Susan's inability to recall exact dates and other details of her encounters with Stein were fully explored on cross-examination and used by Stein's counsel to impeach her credibility.

¶ 23. Fourth, Stein contends that the passage of time prevented him from investigating whether certain prior sexual relationships that Susan described in her deposition had actually occurred. His theory is that if she had fabricated those sexual relationships, that would be evidence that she had fabricated a sexual relationship with him. He is apparently relying on her deposition testimony when he says that one of those men is now dead and "the remaining men are out of the country and thus not available." However, the "remaining men" Stein is apparently referring to are described by Susan in her deposition as an Iraqi pilot and a man whom she met when she lived in the Middle East; it appears neither were ever available in this country. In addition, it is entirely speculative what any of these men would have said about their relationships with Susan. We conclude that the lack of the ability to pursue such speculative avenues does not constitute prejudice for purposes of our due process analysis.

¶ 24. We also observe that Stein testified he did not have notes of his sessions with Susan and is not sure if ever he made notes. The lack of his own notes as an aid in recalling has nothing to do with the passage of time.

¶ 25. In summary, we agree with both the Board and the trial court that Stein has not shown that he was prejudiced by the passage of time between the events relevant to the complaint and the hearing on the complaint.

*Admissibility of Feingold's Testimony*

¶ 26. Both Susan and Feingold testified that, during the course of sessions between December 11, 1986 and March 18, 1987, Susan told Feingold that she and Stein had had an extramarital affair and she had fallen in love with him. Feingold's March 18, 1987 regular clinical notes state, "Susan followed up on her decision to inform her husband about the extramarital affair and also to invite the man she has been involved with to a session to get some closure on all aspects of that relationship."

¶ 27. Susan, Stein, and Feingold each testified concerning the session that occurred on March 25, 1987, at which all three were present. Susan's and Stein's accounts of the purpose of the session were in conflict. According to Susan, she spoke to Stein prior to the session and told him that she needed closure on both their therapeutic and their sexual relationship. According to Stein, he agreed to participate in the therapy session to help Susan resolve her feelings for him. Feingold's regular clinical notes state that the "notes of this [March 25, 1987] session remain confidential." However, Feingold testified that she remembered the session, and she described it. She testified that there was no mention in that session of specific sexual acts that had occurred but, based on the discussion, there was no doubt in her mind that Stein understood they were talking about a sexual relation-

ship, and he never indicated that a sexual relationship had not occurred. Stein objected to this testimony on the ground that Feingold was not competent to testify to Susan's or Stein's state of mind, and that her testimony was an effort to bolster Susan's credibility. The ALJ questioned Feingold on what she understood the conversation to be about and why, and, based on Feingold's explanation, the ALJ overruled the objection.[4]

¶ 28. Admission of evidence by an administrative agency is a matter of discretion. *Board of Regents v. State of Wisconsin Pers. Comm'n*, 2002 WI 79, ¶ 26, 254 Wis. 2d 148, 646 N.W.2d 759. We affirm the agency's discretionary decision if it is based on facts appearing in the record and upon applicable law. *Id.*

¶ 29. Stein acknowledges that the ALJ is not governed by the rules of evidence but instead by Wis. Stat. § 227.45(1) (2001–02),[5] which provides:

---

[4] The testimony of Feingold that Stein challenges is the following:

> THE WITNESS: Well, I knew without a shadow of a doubt that we were talking about the same thing because Dr. Stein would have argued with me or with Susan or would have said, you know, something that would have said, you know, Susan this didn't happen or I'm sorry, you know, that, you know, you believe — He didn't say anything, we were all on the same page. The issue was how to resolve it. The issue was that harm had been done. There was no question at that session about harm being done. And that's how — I didn't have to know about my judgment. I knew that I was talking to two sane people who had been in the same place at the same time and there was no — Dr. Stein at no time said, Susan, you know, when do you think this happened or, you know, where did you get this idea. Never a question.

[5] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

An agency or hearing examiner shall not be bound by common law or statutory rules of evidence. The agency or hearing examiner shall admit all testimony having reasonable probative value, but shall exclude immaterial, irrelevant or unduly repetitious testimony . . . .

However, Stein goes on to contend that Feingold's testimony was inadmissible based on case law applying the rules of evidence, rather than addressing the standard of "reasonable probative value." Specifically, he contends that Feingold's testimony is inadmissible because it goes to Stein's state of mind, it is vouching for Susan's credibility, Feingold lacked personal knowledge of what Stein's thoughts were, and there was no admission by silence. Stein concedes that, even under the rules of evidence, Feingold could testify to what Stein and Susan said, and he apparently concedes that Feingold could also testify to what she herself said.

¶ 30. We conclude the ALJ did not erroneously exercise its discretion in admitting the challenged testimony of Feingold. Feingold's testimony that they were all talking about a sexual relationship is based on her firsthand observations of what was said and not said during that session, which she explained in detail. For example, she testified that Susan and Stein talked about "how irresistible" they found each other, about why the relationship had happened, and when Stein said "he didn't know, he just couldn't help himself," she, Feingold, told him "that's not good enough, that you couldn't help yourself." She also testified that she emphasized that Stein was "responsible for what happened between the two of them even though it was a consensual relationship that Susan very much wanted." The ALJ questioned Feingold on what she understood the conversation to be about and why. Based on Feingold's explanation and the other testimony about the session,

the ALJ could reasonably decide that Feingold's testimony that the conversation was about a sexual relationship had reasonable probative value. WIS. STAT. § 227.45(1).

¶ 31. We do not agree that Feingold's testimony constituted an opinion vouching for Susan's credibility, nor do we agree that Feingold's testimony did not have reasonable probative value simply because she had not discussed with Stein whether, in fact, he had had a sexual relationship with Susan. Finally, because we have concluded that Feingold's testimony did have reasonable probative value, it is unnecessary to decide whether Stein's failure to deny he had a sexual relationship with Susan in that session was admissible as an adoptive admission by a party opponent under WIS. STAT. § 908.01(4)(b)2.[6]

*Sufficiency of the Evidence*

██

¶ 32. Stein contends that the findings that Stein and Susan had a sexual encounter, and that Stein did not deny in the March 27, 1999 session that he had had a sexual relationship with Susan, are not supported by substantial evidence. The only evidence of the latter, he asserts, is Feingold's testimony. This is not substantial evidence in his view because Feingold acknowledged that there was no reference to specific sexual acts that actually occurred and also acknowledged that Stein did not admit he had had a sexual relationship with Susan. According to Stein, without Feingold's testimony there is simply a conflict between Susan's testimony and

---

[6] The trial court did not address this objection because it determined that Stein had waived the objection by not making it at the hearing.

Stein's testimony on the nature of their relationship, and Susan's testimony is not substantial evidence.

¶ 33. Our review of an agency's findings of fact is highly deferential. *Wal-Mart Stores, Inc. v. LIRC*, 2000 WI App 272, ¶ 10, 240 Wis. 2d 209, 621 N.W.2d 633. The court may "not substitute its judgment for that of the agency as to the weight of the evidence on any disputed finding of fact, . . . [but] shall . . . set aside agency action or remand the case to the agency, if it finds that the agency's action depends on any finding of fact that is not supported by substantial evidence." WIS. STAT. § 227.57(6). Substantial evidence in this context means "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wal-Mart Stores, Inc.*, 240 Wis. 2d 209, ¶ 10 (citation omitted). The credibility of the witnesses and the persuasiveness of their testimony are for the agency to determine, *L&H Wrecking Co., Inc. v. LIRC*, 114 Wis. 2d 504, 509, 339 N.W.2d 344 (Ct. App. 1983), as is the determination of what inference to draw from evidence when there is more than one reasonable inference. *Vocational Tech. & Adult Ed. Dist. 13 v. ILHR Dept.*, 76 Wis. 2d 230, 240, 251 N.W.2d 41 (1977). In short, we may set aside the Board's decision because of factual errors only if "upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable person, acting reasonably, could not have reached the decision from the evidence and its inferences." *Wal-Mart Stores, Inc.*, 240 Wis. 2d 209, ¶ 10 (citations omitted).

¶ 34. Applying this standard, we conclude the challenged findings are supported by substantial evidence. The Board accepted the ALJ's judgment that Feingold's testimony was credible. That includes

Feingold's testimony that Susan told her about the sexual nature of the relationship during their therapy sessions before March 25, 1987, from which the ALJ inferred that Feingold believed that the relationship had been sexual. In addition to crediting Feingold's account of the March 27, 1987 session, the ALJ drew certain inferences, which were adopted by the Board: it would have been evident to Stein that Feingold believed he had had a sexual relationship with Susan based on what Feingold testified she said to Stein in the session; if Stein had not had a sexual relationship with Susan, he would have said something to object or protest; if the extent of their sexual relationship had been that Susan had bared her breasts to him, Stein would have told Feingold that; and Stein's failure to tell Feingold that and to say anything to dispel Feingold's impression, which she had conveyed by what she said to Stein, indicates that he and Susan had had a sexual relationship.

¶ 35. The essence of Stein's challenge appears to be to the inference the agency drew from Stein's failure at the March 25, 1987 therapy session to deny that the relationship was sexual. However, we conclude the agency's inference was a reasonable one. It may not have been the only reasonable one; but in our review we are to determine whether the agency could have reasonably drawn the inferences it did, not whether there are other reasonable inferences that could be drawn. *Copland v. Dept. of Taxation*, 16 Wis. 2d 543, 554, 114 N.W.2d 858 (1962). Finally, if Stein intends to argue that substantial evidence cannot consist of reasonable inferences from the evidence, that is not correct. *See Gilbert v. Med. Examining Bd.*, 119 Wis. 2d 168, 195, 349 N.W.2d 68 (1984). We conclude that the inferences the agency drew from the evidence were reasonable

ones and that substantial evidence supports the finding that Stein and Susan had a sexual encounter in the second half of 1986 prior to the termination of Susan's therapy with Stein.

*By the Court.*—Order affirmed.