ESTATE OF Elisabeth HAGENSTEIN, by Dallas E. Klemmer, Representative/Special Administrator, Petitioner-Appellant,

v.

WISCONSIN DEPARTMENT OF HEALTH AND FAMILY SERVICES, Respondent-Respondent.

Court of Appeals

*No. 2005AP1303. Submitted on briefs February 2, 2006. —Decided April 12, 2006.*

2006 WI App 90

(Also reported in 715 N.W.2d 645.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Michael D. Dean*, of *Michael D. Dean, LLC.*, of Waukesha.

■■■■■■

■■■■

On behalf of the respondent-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *Maureen McGlynn Flanagan*, assistant attorney general.

Before Snyder, P.J., Nettesheim and Anderson, JJ.

¶ 1. NETTESHEIM, J.    The Estate[1] of Elisabeth Hagenstein appeals a circuit court judgment that upheld a decision of the Wisconsin Department of Health and Family Services (Department) terminating her institutional Medicaid benefits. The Department determined that Elisabeth's purchase of a life estate in a part of her son's residence using the proceeds of an annuity was a sham divestment of her assets.

¶ 2.    Elisabeth argues that her Medicaid benefits were terminated without proper notice in violation of her due process rights. We disagree. Despite possible confusion generated by the last of three notices provided to Elisabeth by the Washington County Department of Social Services (the County), she did not avail herself of the opportunity to be heard afforded by the first timely given notice, and she ultimately did have a full hearing on the merits of her claim. Also, giving due weight to the Department's determination, we conclude that the transaction triggering the termination of benefits was an improper divestment of Elisabeth's assets under Wis. STAT. § 49.453 (2003–04).[2] We affirm the judgment upholding the Department's determination.

---

[1] Elisabeth died during the course of proceedings below, and her estate and personal representative formally replaced her as a party for purposes of the appeal. Rather than alternate between "Elisabeth" and "the estate," from this point we will refer to the petitioner-appellant as "Elisabeth."

[2] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

## BACKGROUND

¶ 3.  The relevant facts are undisputed. Elisabeth entered a Washington county nursing home in January 1998 when she was nearly ninety years old. She began receiving institutional Medicaid, or medical assistance (MA), benefits on January 23, 1998.[3] The home she owned in Milwaukee was sold shortly thereafter. Approximately $29,500 of the proceeds was used to set up a private balloon payment annuity with her son, Rudy, who also had power of attorney (POA) for Elisabeth's affairs. The annuity was structured so that Rudy would pay Elisabeth $20 per month for five years with a balloon payment of approximately $40,440 to Elisabeth on June 1, 2003.

¶ 4.  On May 21, 2003, the County sent Elisabeth a computer-generated notice informing her that her institutional MA benefits were denied for June and July 2003 because her unearned income had increased, and her income and/or countable assets for that period were projected to be over the limit. The notice pegged Elisabeth's "patient liability" at zero for the month of June, and at $500.40 beginning July 1, 2003. The notice also informed Elisabeth of her appeal rights, including "call[ing] the person listed at the top of this letter" and requesting a fair hearing.[4] Elisabeth did not avail herself of these options at this point.

---

[3] Medicaid is a federal/state program. Medical assistance is one of three Medicaid programs in Wisconsin.

[4] The notice provided, in relevant part:

YOU MAY REQUEST A FAIR HEARING FOR MEDICAL ASSISTANCE . . . if you are not satisfied with any agency's action. You may request the fair hearing in writing or in person with the agency listed on the front of this notice. You may also write to the State Department of Administration, Division of Hearings and

¶ 5. Elisabeth received the $40,440 balloon payment on June 1, 2003. On that same date, she purchased a life estate in a 66% interest of Rudy's residence. Using the life estate table in the Medicaid Eligibility Handbook (MA Handbook),[5] the value of her life estate in that 66% interest was calculated to be $40,811.21. On June 5, 2003, Elisabeth's attorney notified the County of these transactions and Elisabeth's receipt of the balloon payment. Her attorney also furnished the relevant documents, including a quitclaim deed providing, among other things, that, if Rudy were to sell the property, Elisabeth's interest would be extinguished.

¶ 6. On June 13, 2003, the County issued a second notice regarding Elisabeth's MA institutional benefits. This one, a handwritten "Negative Notice," advised of the termination of Elisabeth's full MA institutional benefits effective June 1, 2003, and that she would be eligible only for card services until January 31, 2004.

---

Appeals . . . . Your request must be received within . . . 45 days of the action's effective date for MA . . . .

If your fair hearing request is received by the Division of Hearings and Appeals prior to the action's effective date, in most cases your MA . . . benefits will not stop or be reduced. The benefits will continue at least until the decision on your appeal is made. During this time if another, unrelated change occurs, your . . . MA benefits may change. If another change occurs, you will receive a new notice. You may request another fair hearing if you are not satisfied with it. You may have to repay any excess benefits you receive while your appeal is pending if the fair hearing decision ends or reduces your benefits. You may ask not to receive continued benefits.

[5] The Medicaid Eligibility Handbook is a policy handbook created by the Department pursuant to WIS. STAT. § 49.45(34) designed to assist state and local agencies in implementing the federal MA program. *See Estate of Gonwa v. DHFS,* 2003 WI App 152, ¶ 8 n.4, 265 Wis. 2d 913, 668 N.W.2d 122.

The notice explained that the County deemed the life estate transaction a divestment because Elisabeth converted an available asset into an unavailable one having no value to her. The June 13 notice also advised Elisabeth that she could request a fair hearing.

¶ 7. A third and final notice dated June 16, 2003, followed. This computer-generated notice did not reference the prior two notices and contained information inconsistent with those notices. This notice informed Elisabeth that she was eligible for Medicaid long-term care coverage for June and July 2003; that, effective June 1, 2003, her patient liability would "decrease from $520.40 to $500.40"; and that, effective July 1, 2003, her institutional MA benefits would "remain the same," with $500.40 being her portion. Elisabeth again was advised of her right to request a fair hearing if she disagreed with the decision. Shortly thereafter, the County terminated reimbursements to Elisabeth's provider.

¶ 8. On July 29, 2003, Elisabeth requested a fair hearing. An attachment to the request stated that Elisabeth accepted the June 16 Notice of Decision to the extent that it determined her eligible for long-term care coverage, but that she objected to the June 13 Negative Notice determining her eligible for card services only. The attachment spelled out four grounds supporting Elisabeth's objection/request for a hearing, namely, that the County: (1) incorrectly determined that the life estate purchase was a divestment; (2) incorrectly determined that the divestment determination was contrary to MA Handbook § 14.2.2; (3) incorrectly determined that the life estate had no value although the owner still was living; and (4) failed to identify "any statute, regulation or interpretation" supporting the divestment determination.

¶ 9. An August 5, 2003 letter from the County to the Wisconsin Division of Hearings and Appeals explained that the conversion of Elisabeth's balloon payment into a life estate in a portion of a property where she likely would never reside was divestment in contemplation of qualifying for Medicaid. The letter said this conclusion reflected the State's conclusion, gleaned from "dialogue with the policy help desk."

¶ 10. On August 22, 2003, Elisabeth's fair hearing was held before an administrative law judge (ALJ) of the Division of Hearings and Appeals which handles fair hearings for the Department. *See* Wis. Admin. Code §§ HA 3.01(2), 3.02(1) (Sept. 2001). A County employee testified that when Elisabeth filed an application for MA upon entering the nursing home in January 1998, the County was informed that she "was permanent to the nursing home." Another County employee testified that what triggered the County's scrutiny was Elisabeth's purchase of a life estate in someone else's home. The ALJ expressed skepticism as to why an elderly person, already institutionalized for several years, would purchase a life estate that it "doesn't appear that she can use. I want to know what interest she really has. She can't convert it to anything. She can't sell the property. She can't make it available for her use." The ALJ questioned the purpose of the transaction "besides to solely qualify her for medical assistance," observing that it "looks like a sham transaction to me."

¶ 11. Elisabeth's attorney argued at the hearing that the life estate purchase was not a sham divestment because Elisabeth had paid fair market value and the valuation comported with the MA Handbook, which, he asserted, was the "controlling document for the County." The ALJ disagreed, stating that the state and federal statutes and the Wisconsin Administrative Code

are the controlling sources, making the policy handbook "just that, a policy handbook."

¶ 12. On April 16, 2004, the ALJ affirmed the County's contention that Elisabeth's purchase of the life estate was an improper divestment of her property. The ALJ reasoned that the purchase was not an arm's-length transaction because Elisabeth had received nothing of real value, and that the structure of the transaction was "designed to exactly use the proceeds of the balloon annuity," such that the transaction was "a mere camouflage for a divestment." The ALJ also commented that the "expedient purchase of a life estate" so as to obtain MA raised public policy concerns.

¶ 13. Elisabeth timely filed a petition for judicial review and the circuit court affirmed the ALJ's ruling. Elisabeth appeals.

## DISCUSSION

¶ 14. Elisabeth raises two issues on appeal: whether she was denied procedural due process by the manner in which the County terminated her MA benefits and whether her use of the annuity balloon payment to purchase the life estate in her son's residence constituted a divestment of assets, thus making her ineligible for institutional MA.

¶ 15. The MA program is aimed at ensuring medical care for those who cannot pay for their own care. *Estate of Gonwa v. Wisconsin DHFS*, 2003 WI App 152, ¶ 19, 265 Wis. 2d 913, 668 N.W.2d 122. An individual's eligibility for MA benefits is determined by specific income and asset limits set forth in WIS. STAT. ch. 49. An individual may become ineligible for certain MA benefits by transferring assets in a manner prohibited by statute. WIS. STAT. § 49.453. The prohibitions are in

place to prevent diversion of scarce government resources to those who can afford to pay for their own medical needs. *Gonwa*, 265 Wis. 2d 913, ¶¶ 19, 36. MA is administered by the Department, which may delegate responsibility to county social service departments. WIS. STAT. § 49.45(1), (2)(a)3.

## A. Procedural Due Process

¶ 16.  Elisabeth maintains that her MA institutional benefits were terminated without notice in violation of her Fourteenth Amendment right to due process. Specifically, Elisabeth complains about the termination of her long-term care MA benefits after receipt of the June 16 notice advising her that she was eligible for such benefits for June and July of 2003. Whether a violation of due process has occurred is a question of law that we review de novo. *See Stein v. State Psychology Examining Bd.*, 2003 WI App 147, ¶ 16, 265 Wis. 2d 781, 668 N.W.2d 112.

¶ 17.  Elisabeth's argument skirts the matter of the wholly adequate, and wholly unchallenged, May 21 notice. That notice timely advised Elisabeth in writing of the change in her benefits effective June 1. *See* WIS. ADMIN. CODE § HFS 103.09(4) (FEB. 2002).[6] The May 21 notice further advised:

> **Appeal rights:** If you have any questions or think this action is wrong, call the person listed at the top of this letter. Also, you have the right to ask for an appeal.

---

[6] WISCONSIN ADMIN. CODE § HFS 103.09(4) provides:

TIMELY NOTICE. The agency shall give the recipient timely advance notice and explanation of the agency's intention to terminate MA. This notice shall be in writing and shall be mailed to the recipient at least 10 calendar days before the effective date of the proposed action. The notice shall clearly state what action the agency intends to take and the specific regulation supporting that action,

**Fair hearing:** If you disagree with this decision, you can ask for a Fair Hearing . . . . Please read Your Rights and Responsibilities for . . . Medical Assistance . . . on the next page for more information . . . .

The "Your Rights and Responsibilities" section on the next page reiterated that Elisabeth could request a fair hearing, and that if her request was received before the effective date of the termination of benefits, her benefits likely would not be stopped or reduced pending resolution of the challenge.

¶ 18.   Elisabeth did not request a fair hearing or otherwise appeal the May 21 notice of the benefit termination. Accordingly, her benefits terminated effective June 1 as the notice had advised her they would. The June 16 notice may have caused confusion but was irrelevant to Elisabeth's due process claim of lack of notice, since the May 21 notice of benefit termination was timely given and apprised her of her opportunity to be heard. Furthermore, once Elisabeth did request a hearing, she was afforded a full hearing on the substantive issue of her eligibility. We see no due process violation.

## B. Divestment of Assets

### 1. Standard of Review

¶ 19.   The remaining issue is whether Elisabeth's purchase of the life estate constituted an improper divestment of her assets. We begin by addressing our

and shall explain the right to appeal the proposed action and the circumstances under which MA is continued if a fair hearing is requested.

standard of review. Because the appeal involves an administrative agency's decision, our review has several facets. We review the decision of the administrative agency, not that of the circuit court. *Trott v. DHFS*, 2001 WI App 68, ¶ 4, 242 Wis. 2d 397, 626 N.W.2d 48. An agency's factual findings will be upheld on appeal if supported by substantial evidence. *Krahenbuhl v. Wisconsin Dentistry Examining Bd.*, 2004 WI App 147, ¶ 15, 275 Wis. 2d 626, 685 N.W.2d 591. Substantial evidence, for the purpose of reviewing an administrative decision, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*, ¶ 16.

¶ 20.    In reviewing an agency's statutory interpretations, we apply one of three distinct levels of deference—great weight, due weight or de novo review —depending on the nature of the determination. *Tannler v. DHSS*, 211 Wis. 2d 179, 184, 564 N.W.2d 735 (1997). Great weight deference is warranted where

> 1) the agency was charged by the legislature with the duty of administering the statute; 2) the interpretation of the agency is one of long standing; 3) the agency employed its specialized knowledge or expertise in forming the interpretation; and 4) the agency's interpretation will provide consistency and uniformity in the application of the statute.

*Id.* Due weight is appropriate if the agency conclusion does not meet all of the criteria necessary to accord it great weight deference, or if it is "very nearly one of first impression." *Id.* (citation omitted). Our review is de novo if the case is one of first impression for the agency and the agency lacks any special expertise. *Id.* We review de novo any interpretation of Wisconsin's MA

statutes and regulations and their application to undisputed facts. *Gonwa*, 265 Wis. 2d 913, ¶ 25.

¶ 21.   The parties disagree on the appropriate level of scrutiny to be given the ALJ's decision. Elisabeth urges de novo review, asserting that "choice of valuation methodologies" is a question of law, and that the ALJ assessed fair market value in a manner inconsistent with the MA Handbook. The Department submits that, regardless of whether this particular question is one of first impression, its determination is entitled at least to due weight, given the broad experience gained from carrying out its statutory responsibility for administering the MA program. We agree with the Department and, for reasons set out below, disagree with Elisabeth that the fair market value determination ran contrary to the MA Handbook. Accordingly, even if another interpretation is equally reasonable, we will sustain the ALJ's interpretation unless another is more reasonable. *See UFE Inc. v. LIRC*, 201 Wis. 2d 274, 287, 548 N.W.2d 57 (1996).

### 2. The "Life Estate" Purchase

¶ 22.   The ALJ determined that Elisabeth's purchase of a nominal life estate in a portion of real estate owned by her son using her annuity proceeds was a camouflage for a divestment of assets. Elisabeth disputes the ALJ determination on two fronts:   that purchasing a life estate in and of itself is not a divestment and, further, that she received fair market value for the life estate.

¶ 23.   Divestment is a transfer of assets by an institutionalized individual for less than fair market value within thirty-six months of applying for institu-

tional MA, also called the "look-back date." WIS. STAT. §§ 49.453(1)(f)1., 49.453(2)(a). "Assets" broadly include all income and resources of the individual, including any to which the individual is entitled but does not receive because of action by the individual or his or her spouse. *See* § 49.453(1)(a). For institutionalized persons such as Elisabeth, divestment generally will result in ineligibility for MA benefits for nursing facility services for a period of time determined according to a statutory formula. *See* § 49.453(2)(a)1., (3).

¶ 24.   Elisabeth first contends her purchase of the life estate was not a divestment under the provisions of the MA Handbook. She asserts that she simply converted her annuity proceeds of approximately $40,440 to a life estate to which she acquired and retained title. According to the MA Handbook, she argues, "[c]onverting an asset from one form to another is not divestment." She also maintains that both the administrative code and the MA Handbook recognize that a life estate does not impact eligibility. *See* WIS. ADMIN. CODE § HFS 103.06(6) (providing that an MA applicant or recipient may hold a life estate without affecting eligibility for MA), and MA Handbook, Appendix § 11.8.1.5 (providing that a life estate in homestead property is an unavailable asset). The parties agree, as do we, that the proper calculations were made to determine the value of a life estate according to the MA Handbook tables. However, it was not the computation or the choice of tables that gave the County and the ALJ pause; rather, it was the reason the claimed life estate came into being in the first place and the questionable true value of that claimed asset.

¶ 25.   Indeed, Elisabeth acknowledges that if an asset is used in a manner making it unavailable and an individual does not receive fair market value for the

asset, the County is instructed to treat the asset as a divestment. *See* MA Handbook, Appendix § 14.2.10. The Code mirrors this policy. *See* WIS. ADMIN. CODE § HFS 103.065(4)(d)2.a. (providing that an institution-alized individual determined to have made a prohibited divestment will be ineligible for MA unless he or she intended to dispose of the resource at fair market value or for other valuable consideration). The essential inquiry, therefore, is whether Elisabeth disposed of her annuity proceeds in exchange for fair market value.

### 3. Fair Market Value

¶ 26. Using the $40,440 annuity proceeds, Elisabeth purchased a life estate in a 66% interest of her son's residential property. The parties agree that according to a table in the MA Handbook, the value of a life estate in that 66% interest was calculated to be $40,811.21. The ALJ concluded this constituted divestment because the deal was not an arm's-length transaction, but "a mere camouflage for a divestment." The ALJ stated:

> [Elisabeth] has received nothing of real value here. She has no use of the property. She is not collecting rent. The structure of the transaction—an interest in a 66% share of the son's home—is designed to exactly use the proceeds of the balloon annuity . . . . Would [she] be willing to pay $40,800 to an unrelated third party for this life estate? There is no evidence to suggest that she will be discharged from the nursing home . . . .

¶ 27. Elisabeth does not challenge these findings in themselves. Rather, she argues that the ALJ's reasoning here as to fair market value runs contrary to that in two other divestment cases she cites and thus should be overturned. We disagree.

¶ 28.   "Fair market value" is not defined in the medical assistance statutes. However, the MA Handbook defines it as "an estimate of the prevailing price an asset would have had if it had been sold on the open market at the time it was transferred." The term also has been defined as "the amount [the property] will sell for upon arm's-length negotiation in the open market, between an owner willing but not obliged to sell, and a buyer willing but not obliged to buy." *Buettner v. DHFS*, 2003 WI App 90, ¶ 18, 264 Wis. 2d 700, 663 N.W.2d 282 (citation omitted).

■■

¶ 29.   The informal findings in the text of the ALJ's decision and the record support the ALJ's conclusion that the life estate transaction was a sham transaction by which Elisabeth divested herself of her annuity balloon payment. Elisabeth had entered the nursing home facility as "permanent to the nursing home." At the time of the life estate transaction Elisabeth had been in a nursing home for five years with no realistic expectation of release. As such, Elisabeth could not use the life estate at the time of her purchase, and she had no reasonable future expectation of being able to do so. If Rudy should sell the property, Elisabeth's life estate would be extinguished. Thus, the ALJ reasonably concluded that the life estate represented nothing of significant monetary value to Elisabeth. The ALJ also noted the oddity of a 66% interest in a life estate, questioning "how in practice it works to obtain an interest in just 66% of a property." The ALJ also noted that the balloon annuity payment and the 66% life estate were virtually identical.

¶ 30.   These findings are supported by substantial evidence, and we share the concerns they raise. A tenant for life is entitled to the full use and enjoyment

of the property in which he or she has a life estate. 51 Am. Jur. 2d *Life Tenants and Remaindermen* § 28 (2000). Yet Elisabeth purchased the life estate years after being institutionalized and without any realistic hope of ever exercising any use or enjoyment of it. As a practical matter, she could not sell her 66% interest in the home Rudy and his wife occupied, and her interest in it would cease upon their sale of it. Thus, the characterization of the conveyance as an arm's-length transaction is dubious. *See Siker v. Siker*, 225 Wis. 2d 522, 533, 593 N.W.2d 830 (Ct. App. 1999) (where buy-out provisions of a shareholders agreement held not to be an arm's-length transaction between business partners who were brothers, since term means "not closely or intimately connected or associated").

¶ 31.   The two fair hearing cases Elisabeth relies upon do not salvage her position because neither presents the precise issue or factual scenario presented here. In one, the petitioner was held not to have divested herself of a life estate created years earlier simply by being admitted to a nursing home and without executing any transfer documents to that effect. *See* Division of Hearings and Appeals Case No. MDV-67/60174. In the other, divestment was held to have occurred because, although the petitioner's life estate was drafted to terminate when one or both of the grantors no longer could occupy the residence "due to health or other reasons," the ALJ found that the life estate did not terminate. *See* Division of Hearings and Appeals Case No. MDV-55/56449. Although Case No. MDV-55/56449 discussed the value of a life estate, the ALJ's express concern was that the purpose of the life estate was to avoid using the property for petitioner's medical costs. *See id.* at 2. The ALJ in Elisabeth's case echoed the concern that to permit such transactions

offends MA's policy underpinnings. *See also Gonwa*, 265 Wis. 2d 913, ¶¶ 19, 36; *Buettner*, 264 Wis. 2d 700, ¶ 10.

¶ 32. In sum, the ALJ rested his decision on the appropriate sections of the statutes, administrative code, and the MA Handbook, and substantial evidence supports his findings. We cannot say that any other interpretation of the transaction is more reasonable than the conclusion the ALJ drew.

## CONCLUSION

¶ 33. Despite the evidently mistaken third notice, Elisabeth's due process rights were not jeopardized. She did not avail herself of her right to a hearing when she received the timely first notice, and once she did request a hearing, her challenge was fully aired. We also agree that Elisabeth's so-called "life estate" elevated form over substance, and more accurately can be described as a gift of the annuity proceeds to her son. Accordingly, we affirm the judgment upholding the ALJ's ruling.

*By the Court.*—Judgment affirmed.