L.L., Plaintiff-Appellant,

v.

The MEDICAL PROTECTIVE COMPANY,
Defendant-Respondent,

Barry SIEGEL, M.D. and the County of Milwaukee,
Defendants.†

Court of Appeals

*No. 84–507. Submitted on briefs November 7, 1984.—
Decided December 21, 1984.*
(Also reported in 362 N.W.2d 174.)

† Petition to review denied.

456

For the plaintiff-appellant the cause was submitted on the briefs of *Fox, Carpenter, O'Neill & Shannon, S.C.,* with *Jeffrey A. Kremers* of counsel, of Milwaukee.

For the defendant-respondent the cause was submitted on the briefs of *Kluwin, Dunphy & Hankin,* with *Michael J. Pfau* and *James G. Allison* of counsel, of Milwaukee.

Before Wedemeyer, P.J., Moser and Sullivan, JJ.

WEDEMEYER, P.J.  L.L. appeals from a summary judgment entered in her malpractice action against her psychiatrist, Barry Siegel, which dismissed from the action Siegel's malpractice insurer, the Medical Protective Company. The issue is whether L.L.'s claim for damages resulting from Siegel's engaging in sexual acts with her during the course of her treatment is a "claim for damages . . . based on professional services rendered or which should have been rendered." We hold that because a psychiatrist's performance of sexual acts with a patient can constitute failure to give proper treatment, L.L.'s claim comes within the quoted policy language. We therefore reverse the judgment insofar as it dismissed the insurance company from the action and remand with instructions to reinstate the insurance company as a defendant. Because L.L. does not challenge the trial court's dismissal of her claim against the insurance company for punitive damages, we affirm that part of the judgment.

In April 1982, L.L. retained Siegel, a psychiatrist at the Milwaukee County Mental Health Complex, to provide treatment for certain emotional disorders from which she was suffering. The disorders stemmed from L.L.'s difficulty in maintaining healthy interpersonal relationships, particularly relationships with men. During therapy sessions in August and September of 1982, Siegel engaged in two acts of fellatio with L.L. After the September incident, L.L. reported Siegel's actions to the Mil-

waukee County Sheriff's Department. Sheriff's deputies outfitted L.L. with a hidden microphone which she was to wear to her next therapy session. L.L. was to say a code word into the microphone if Siegel initiated any sexual activity. When L.L. went into Siegel's office, the deputies discovered that the microphone was malfunctioning. They telephoned L.L. in Siegel's office and told her the microphone was not working, but they took no further steps to prevent a reoccurrence of the prior incidents. During this therapy session, Siegel engaged in a third act of fellatio with L.L.

L.L. brought a malpractice action for compensatory and punitive damages against Siegel and his insurer, and a separate claim against Milwaukee County, alleging negligent supervision of Siegel and the sheriff's deputies. The insurance company moved for summary judgment dismissing it from the action. It argued that the sexual acts were not professional medical services and therefore were not covered under the policy. It further argued that payment of punitive damages was precluded under a policy exclusion for "any punitive damages or damages over and above compensatory damages which may be assessed against the insured." The trial court held that the sexual acts were not professional services and therefore were not covered by the policy. It consequently dismissed L.L.'s claim against the insurance company. We reverse.

On a motion for summary judgment, the court must determine whether there is a genuine issue of material fact to be tried and, if not, whether the moving party is entitled to judgment as a matter of law. Sec. 802.08(2), Stats. In the present case, there is no dispute of material fact regarding what occurred; the only issue is whether the essentially undisputed events are covered by the insurance policy. Construction of an unambigu-

ous insurance policy is a question of law which we may determine independently on appeal. *Reserve Life Insurance Co. v. La Follette,* 108 Wis. 2d 637, 645–46, 323 N.W. 2d 173, 177 (Ct. App. 1982).

The insurance company argues on appeal that the coverage clause of the policy is not invoked because Siegel's sexual acts were not "professional services." In *Zipkin v. Freeman,* 436 S.W.2d 753 (Mo. 1968), a case which involved identical policy language, the psychiatrist's malpractice insurer made this same argument when faced with a claim based on sexual, social, and other extra-therapeutic contact between the psychiatrist and his patient. The *Zipkin* court stated:

[I]t is an oversimplification to focus on the more spectacular and extreme acts of the doctor as determinative of the issue. Under the extremely broad terms of the policy before us, defendant agreed to pay damages "based on"—which would also mean resulting from, or caused by, or due to—professional services rendered or which should have been rendered. . . . Defendant would limit the damages to the very act itself of professional services, but the policy clearly covers the results and liability flowing from professional services rendered or which should have been rendered.

The gravamen of the petition is that defendant did not treat Mrs. Zipkin properly and as a result she was injured. He mishandled the transference phenomenon, which is a reaction the psychiatrists anticipate and which must be handled properly.

*Id.* at 761.

We find the reasoning of *Zipkin* persuasive. The language of the policy, "professional services rendered or which should have been rendered," covers malpractice both of commission and of omission—the rendering of substandard treatment and the failure to render indicated treatment. Medical authorities are nearly unanimous in considering sexual contact between therapist and patient to be malpractice. *See* Davidson, *Psychiatry's Problem with No*

*Name: Therapist-Patient Sex*, 37 Am. J. Psychoanalysis 43, 48–49 (1977) ("[I]t is generally agreed that therapist-patient sex is psychologically deleterious for the involved woman patient and is unethical practice for the male practitioner . . . ."); Stone, *The Legal Implications of Sexual Activity Between Psychiatrist and Patient*, 133 Am. J. Psychiatry 1138, 1139 (1976) ("[T]he experts would . . . agree . . . that 'there are absolutely no circumstances which permit a psychiatrist to engage in sex with his patient.' All such instances constitute misuse of the transference.").

The American Psychiatric Association has approved annotations to the American Medical Association's Principles of Medical Ethics which are directed specifically to psychiatrists. One of the annotations provides:

> The patient may place his trust in his psychiatrist knowing that the psychiatrist's ethics and professional responsibilities preclude him from gratifying his own needs by exploiting the patient. This becomes particularly important because of the essentially private, highly personal, and sometimes intensely emotional nature of the relationship established with the psychiatrist.
> The requirement that the physician "conduct himself with propriety in his profession and in all the actions of his life" is especially important in the case of the psychiatrist because the patient tends to model his behavior after that of his therapist by identification. Further, the necessary intensity of the therapeutic relationship may tend to activate sexual and other needs and fantasies on the part of both patient and therapist, while weakening the objectivity necessary for control. Sexual activity with a patient is unethical.

American Psychiatric Association, *The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry*, 130 Am. J. Psychiatry 1058, 1061 (1973). Disregarding this proscription can lead to expulsion from professional associations, *see* Riskin, *Sexual Relations Between Psychotherapists and Their Patients: Toward*

*Research or Restraint,* 67 Calif. L. Rev. 1000, 1003 (1979), or to revocation of the psychiatrist's license to practice. *See* A. Holder, *Medical Malpractice Law* 345 (1975).

The "transference" referred to above is the emotional reaction which the patient in therapy has toward the therapist. The patient in therapy "unconsciously attributes to the psychiatrist or analyst those feelings which he may have repressed towards his own parents. . . . [I]t is through the creation, experiencing and resolution of these feelings that [the patient] becomes well." D. Dawidoff, *The Malpractice of Psychiatrists* 6 (1973). "Inappropriate emotions, both hostile and loving, directed toward the physician are recognized by the psychiatrist as constituting . . . the transference. The psychiatrist looks for manifestations of the transference, and is prepared to handle it as it develops." Heller, *Some Comments to Lawyers on the Practice of Psychiatry,* 30 Temp. L. Q. 401, 401–02 (1957).

The development of the transference "may be coincident with an identification with the therapist whereby the patient learns to think, style and model himself after the therapist." Dawidoff, *supra* (footnote omitted). This gives the patient "a model to steer by and emulate" —something strong and healthy the patient may hold onto while in a state of search. *Id.* at 9. The patient "develop[s] extreme emotional dependence on the therapist." Masters and Johnson, *Principles of the New Sex Therapy,* 133 Am. J. Psychiatry 548, 553 (1976). "[A] sexual liaison in such a situation has all the earmarks of exploitation." Siassi and Thomas, *Physicians and the New Sexual Freedom,* 130 Am. J. Psychiatry 1256, 1257 (1973). *Accord,* Masters and Johnson, *supra.*

In order to benefit from therapy, the patient must develop a trusting relationship with the psychiatrist. Heller, *supra,* at 405, 406.

The first and the most basic element of the· doctor's charge is acting with this sense of imparting trust always guiding and governing the relationship. The relationship between the psychiatrist and his patient is of the most extreme confidence. This is not simply because the things that are talked about are the secrets of the soul but because the patient's continued and embryonic stability may depend upon there being a reliable external source of meaning and later of identification and direction for him.

Dawidoff, *supra,* at 10. This trusting relationship is broken if the psychiatrist abandons the therapeutic role and instead uses the patient to gratify his own needs. *See* American Psychiatric Association, *Principles of Medical Ethics, supra.* "[I]f the doctor fails in being trustworthy . . . the entire course of treatment may be ruined." Dawidoff, *supra,* at 10.

It is apparent from the foregoing that a sexual relationship between therapist and patient cannot be viewed separately from the therapeutic relationship that has developed between them. The transference phenomenon makes it impossible that the patient will have the same emotional response to sexual contact with the therapist that he or she would have to sexual contact with other persons. Further, by introducing sexual activity into the relationship, the therapist runs the risk of causing additional psychological damage to the patient. The trial court erred by holding that Siegel was not acting in the course of his professional services or professional responsibilities when he engaged in sexual activity with L.L.

Courts of other jurisdictions hold that a patient's complaint alleging sexual contact with his or her therapist states a claim for malpractice which is covered by the therapist's professional liability insurance. *See Aetna Life & Casualty Co. v. McCabe,* 556 F. Supp.

1342, 1353 (E.D. Pa. 1983) ; *St. Paul Fire & Marine Insurance Co. v. Mitchell,* 296 S.E.2d 126, 127–28 (Ga. App. 1982) ; *Vigilant Insurance Co. v. Kambly,* 319 N.W.2d 382, 384 (Mich. App. 1982) ; *Zipkin,* 436 S.W.2d at 761, 762. In *Kambly,* the court noted that the insurance policy covered injury from any rendering or failure to render professional services. It stated: " 'We see no reason for distinguishing this type of malpractice and others, such as improper administration of a drug or a defective operation. In each situation, the essence of the claim is the doctor's departure from proper standards of medical practice.' " 319 N.W.2d at 384, *quoting Cotton v. Kambly,* 300 N.W.2d 627, 628–29 (Mich. App. 1980). We find this reasoning persuasive. We conclude that L.L.'s complaint comes within the policy language "claim for damages . . . based on professional services rendered or which should have been rendered, by the insured." We reverse the trial court's dismissal of L.L.'s complaint against the insurance company for compensatory damages.

The insurance company contends that coverage is barred by a policy exclusion for "payment of damages . . . if said damages are in consequence of the performance of a criminal act . . . ." It asserts that the sexual acts here were criminal under secs. 940.225 (3), Stats.,[1] and 944.17 (1), Stats. (1981–82).[2] It argues that Siegel's actions therefore fall within the policy exclusion.

---

[1] Section 940.225, Stats., provides in part:

(3) Whoever has sexual intercourse with a person without the consent of that person is guilty of a Class D felony.

. . . .

(4) "Consent," as used in this section, means words or overt actions by a person who is competent to give informed consent indicating a freely given agreement to have sexual intercourse or sexual contact.

[2] Section 944.17, Stats. (1981–82), provides in part:

Whoever does either of the following is guilty of a Class A misdemeanor:

L.L. does not merely allege, however, that she was damaged by Siegel's performance of criminal acts. She alleges that she was damaged by Siegel's failure to exercise the degree of skill and care ordinarily exercised by other psychiatrists and by Siegel's failure to provide appropriate forms of treatment.[3] These are allegations of malpractice, not of criminality.

The insurance policy does not clearly indicate whether it is meant to cover acts by the insured psychiatrist which constitute or are evidence of malpractice but which also are defined as criminal. Where the meaning of an insurance policy is unclear, it must be construed against the insurer and in favor of coverage. *Katzke v. Randolph & Scott Mutual Fire Insurance Co.,* 116 Wis. 2d 206, 213, 341 N.W.2d 689, 692 (1984). Further, Wisconsin law recognizes that a liability insurance contract exists for the benefit of injured members of the public as well as for the benefit of the insured. *See Dietz v. Hardware Dealers Mutual Fire Insurance Co.,* 88 Wis. 2d 496, 503–04, 276 N.W.2d 808, 812 (1979). The policy involved here was intended to compensate persons who have been

---

(1) Commits an abnormal act of sexual gratification involving the sex organ of one person and the mouth or anus of another . . . .

[3] L.L. argues in her brief that Siegel, by engaging in the sexual acts:

(1) either failed to properly diagnose L.L.'s problems or improperly diagnosed them;

(2) either failed to properly analyze and predict the effect of the acts on L.L.'s behavior or recklessly acted without regard to their effect;

(3) detrimentally influenced L.L.'s behavior (particularly as to interpersonal relationships);

(4) failed to prevent, ameliorate or resolve L.L.'s emotional disorders, particularly as concerns interpersonal relationships; and

(5) worsened the precise emotional disorders which L.L. retained Siegel to treat and created new traumas stemming directly from his acts.

injured by Siegel's malpractice. L.L. alleges that she is within that group. We therefore hold that the policy exclusion for criminal acts does not bar coverage in this case.

In summary, the judgment is reversed insofar as it dismissed L.L.'s claim against the insurance company for compensatory damages. The case is remanded and the trial court is instructed to reinstate the insurance company as a defendant. The judgment is affirmed insofar as it dismissed L.L.'s claim against the insurance company for punitive damages.

*By the Court.*—Judgment affirmed in part, reversed in part and cause remanded for proceedings consistent with this opinion. Costs to appellant.