Ze'ev BAR-AV, Ph.D., Petitioner-Appellant,†

v.

PSYCHOLOGY EXAMINING BOARD,
Respondent-Respondent.

Court of Appeals

*No. 2004AP3251. Submitted on briefs October 11, 2005.*
*—Decided January 25, 2007.*

2007 WI App 21

(Also reported in 728 N.W.2d 722.)

---

† Petition to review denied 4/17/07.

---

388

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *George B. Strother* and *Kristin J. Sederholm* of *Krekeler Strother, S.C.*, Madison.

On behalf of the respondent-respondent, the cause was submitted on the brief of *Thomas J. Balistreri*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Lundsten, P.J., Deininger and Higginbotham, JJ.

¶ 1. HIGGINBOTHAM, J. Dr. Ze'ev Bar-Av appeals an order of the circuit court affirming an administrative decision of the Psychology Examining Board (the Board) revoking his license to practice psychology, based upon findings of professional misconduct. Bar-Av

argues that the Board's interpretation of its rules of professional conduct, in particular Wis. Admin. Code § PSY 5.01(2), (4), (14) and (17),[1] is contrary to their plain language, and therefore is plainly erroneous. Bar-Av also argues that the Board's findings of fact and conclusions of law are not supported by substantial evidence. Finally, Bar-Av argues that various proce-

---

[1] Wisconsin Admin. Code § PSY 5.01 addresses professional conduct requirements for psychologists and states, in relevant part:

> The practice of psychology is complex and varied and, therefore, allows for a broad range of professional conduct. The following acts constitute unprofessional conduct by applicants for licensure and licensees of the board and are prohibited. Complaints regarding these acts shall be investigated and may lead to disciplinary proceedings.
>
> . . . .
>
> (2) Gross negligence in the practice of psychology.
>
> . . . .
>
> (4) Performance of professional services inconsistent with training, education, or experience.
>
> . . . .
>
> (14) Engaging in sexual contact, sexual conduct, kissing, or any other behavior which could reasonably be construed as seductive, romantic, harassing, or exploitative, with any of the following:
>
> (a) A client.
>
> (b) A former client within 2 years of termination of professional services.
>
> (c) A former client beyond 2 years of termination of professional services, unless the licensee can demonstrate that there has been no exploitation of the former client . . . .
>
> . . . .
>
> (17) Failure to avoid prohibited dual relationships.

dural errors in the administrative hearing deprived him of a fair hearing and violated his due process rights.

¶ 2. We conclude, applying the controlling weight standard, that the Board's interpretation of the rules at issue here is reasonable and consistent with their purpose. We also conclude that the Board's findings of fact and conclusions of law are supported by substantial evidence. Finally, we conclude that Bar-Av received a fair hearing and that his due process rights were not violated. We therefore affirm the circuit court's order affirming the Board's decision revoking Bar-Av's license to practice psychology in Wisconsin.

## BACKGROUND[2]

¶ 3. On March 24, 2003, the Wisconsin Department of Regulation and Licensing, Division of Enforcement (DOE), filed a complaint against Bar-Av, a psychologist licensed to practice psychology in Wisconsin, alleging various charges of professional misconduct. These charges stem from the undisputed fact that Bar-Av entered into a personal and sexual relationship with Ms. B, a former patient. Bar-Av provided joint and individual therapeutic services to Ms. B and her husband Mr. A. The DOE charged Bar-Av with (1) practicing psychology in a less than minimally competent

---

[2] In his opening brief, Bar-Av failed to provide appropriate record citations, in violation of WIS. STAT. RULE 809.19(1)(d) (2003–04) of the rules of appellate procedure. RULE 809.19(1)(d) requires parties to set out facts "relevant to the issues presented for review, with appropriate references to the record." An appellate court is improperly burdened where briefs fail to properly cite to the record. *See Meyer v. Fronimades*, 2 Wis. 2d 89, 93–94, 86 N.W.2d 25 (1957).

All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

manner and engaging in unprofessional conduct in general violation of WIS. ADMIN. CODE § PSY 5.01; (2) performing professional services inconsistent with training, education and experience and engaging in unprofessional conduct, in violation of § PSY 5.01(4); (3) acting with indifference to, or disregard of, the harmful impact his behavior would have on Mr. A constituting gross negligence and unprofessional conduct, in violation of § PSY 5.01(2); (4) engaging in sexual contact, conduct or any other behavior that could reasonably be construed as seductive with Ms. B without being able to demonstrate lack of exploitation in light of all relevant factors, in violation of § PSY 5.01(14); and (5) failing to avoid dual relationships that could impair his objectivity or create a conflict of interest, in violation of § PSY 5.01(17).

¶ 4. After a contested five-day evidentiary hearing, the administrative law judge (ALJ) concluded that Bar-Av engaged in unprofessional conduct as defined by WIS. ADMIN. CODE § PSY 5.01(2), (4), (14), and (17). Based on the ALJ's proposed decision, and after considering the parties' objections to the proposed decision and the entire record, the Board adopted the ALJ's proposed findings and conclusions.[3] The only variance between the Board's decision and the ALJ's proposed decision related to the discipline imposed on Bar-Av. Rather than suspend Bar-Av's license, the Board revoked Bar-Av's license to practice psychology in Wisconsin and ordered Bar-Av to pay costs incurred in this case. Bar-Av sought judicial review of the Board's

---

[3] Although the Board did not expressly incorporate the ALJ's opinion into its order, the Board determined that the ALJ's opinion contained a useful analysis of the evidence. Throughout this opinion we will refer to the ALJ's opinion as the Board's opinion.

decision, pursuant to WIS. STAT. ch. 227. The circuit court affirmed the Board's decision. Bar-Av appeals.

## STANDARD OF REVIEW

¶ 5. This appeal is taken from a circuit court decision affirming an administrative agency's decision. The scope of our review is the same as the circuit court's. *Target Stores v. LIRC*, 217 Wis. 2d 1, 11, 576 N.W.2d 545 (Ct. App. 1998). We review the Board's decision, not the circuit court's. *Stein v. Wisconsin Psychology Examining Bd.*, 2003 WI App 147, ¶ 9, 265 Wis. 2d 781, 668 N.W.2d 112.

¶ 6. The interpretation of an administrative rule, like the interpretation of a statute, is generally a question of law, subject to de novo review. *Brown v. Brown*, 177 Wis. 2d 512, 516, 503 N.W.2d 280 (Ct. App. 1993). However, we accord controlling weight deference to an administrative agency's interpretation of its own promulgated rules, unless the interpretation is plainly erroneous or inconsistent with the language of its rules. *Pfeiffer v. Board of Regents of Univ. of Wis. Sys.*, 110 Wis. 2d 146, 154–55, n.12, 328 N.W.2d 279 (1983) (citations omitted).[4]

---

[4] On appeal, the Board questions whether we intended to modify this standard through language in a footnote in *Kruczek v. DWD*, 2005 WI App 12, 278 Wis. 2d 563, 692 N.W.2d 286, in which, after discussing the deference we accord an agency's interpretation of its own rules, we noted that "[t]here are lower levels of deference." *Id.* at ¶ 12 n.3. We note that the lower levels of deference referenced in the *Kruczek* footnote apply to cases involving an agency's interpretation of statutes. *See id.*, citing *Sauk County v. WERC*, 165 Wis. 2d 406, 413–14, 477

## DISCUSSION

¶ 7. We discuss first the topic of whether the Board's construction of its rules of professional conduct is reasonable. We then address the application of each rule the Board concluded Bar-Av violated to the facts of record. We finally discuss the procedural errors Bar-Av complains of.

### A. *The Board's Interpretation of its Rules is Reasonable and Consistent with their Purpose*

¶ 8. Bar-Av argues that the Board's interpretation of its rules of professional conduct is contrary to their plain language, and therefore is plainly erroneous.[5] Specifically, Bar-Av contends that the plain language of Wis. Admin. Code § PSY 5.01(2) and (4) regulates unprofessional conduct in the *practice* of psychology only. Put another way, Bar-Av contends that the regulations relate specifically to the manner in which professional services are provided or performed; they do not address post-therapeutic conduct of a psychologist. Thus, ac-

N.W.2d 267 (1991). Consequently, we do not read *Kruczek* as changing the standard of review of an agency's interpretation of its own rules. In addition, the supreme court recently reaffirmed the well-established rule of reviewing an agency's interpretation of its own rules in *Orion Flight Servs., Inc. v. Basler Flight Serv.*, 2006 WI 51, ¶ 18, 290 Wis. 2d 421, 714 N.W.2d 130 ("[T]his court gives deference to an agency's settled 'interpretation and application of its own administrative regulations unless the interpretation is inconsistent with the language of the regulation or is clearly erroneous.' ") (citation omitted).

[5] Bar-Av asserts that because the Board's interpretation of its rules is plainly erroneous, it therefore lacks jurisdiction in this case. This argument is undeveloped. We need not address an argument inadequately briefed. *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

cording to Bar-Av, because the Board applied these rules to what both parties agree is conduct occurring after therapeutic services to Mr. A and Ms. B had terminated, the Board's interpretation of these rules is plainly erroneous and inconsistent with the purpose underlying these rules.

¶ 9. The Board counters that Bar-Av has not shown that its interpretation of WIS. ADMIN. CODE § PSY 5.01(2) and (4) is unreasonable, because he has failed to show that its interpretation is inconsistent with the language of these regulations. Specifically, the Board argues that none of these rules contain language specifically limiting their applicability to conduct occurring during the therapeutic relationship. Rather, according to the Board, construing these rules as applying to post-therapy conduct is necessary to effectuate the purpose of protecting the health, safety or welfare of former clients. We agree with the Board.

¶ 10. When interpreting an administrative rule, we apply many of the same rules used to interpret statutes. *See Brown*, 177 Wis. 2d at 516. "Our purpose is to ascertain and give effect to the intent of the regulation." *Id.* (citation omitted). Interpretation of an administrative rule begins with the plain language of the regulation. *Id.* We give the text its common, ordinary, and accepted meaning, except that we give technical or specially defined words their technical or special definitions. *See State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. In construing an administrative rule we are to give deference to the policy choices made by the agency in promulgating the rule. *See id.*, ¶ 44; *Brown*, 177 Wis. 2d at 516. "If [the rule] clearly and unambiguously sets forth the intent, it is our duty . . . to apply that

intent to the facts and circumstances of the question presented." *Brown*, 177 Wis. 2d at 516.

¶ 11. We begin by stating the purpose of the Board's rules of professional conduct. "Public protection underlies the psychology licensure requirements in sec. 455.04(1), Stats., and the grounds in sec. 455.09 to . . . revoke . . . a license to practice psychology." *Davis v. Psychology Examining Bd.*, 146 Wis. 2d 595, 600, 431 N.W.2d 730 (Ct. App. 1988). The Board explains that the purpose of these rules is to protect the health, safety or welfare of clients or patients.[6]

¶ 12. It is helpful to examine how the Board applied these rules to the facts of record to understand how the Board interpreted them. Before doing so, we first observe that there is nothing in the text of any of the rules at issue here indicating that the agency intended to limit their application to the period of the ongoing therapeutic relationship. The opposite is true; the plain language of Wis. ADMIN. CODE § PSY 5.01(2) and (4) supports the Board's liberal interpretation and application of the rules to post-therapeutic conduct. We now turn to examine how the Board applied these rules to the facts as a means of understanding how the Board construed the rules.

*1. WISCONSIN ADMIN. CODE § PSY 5.01(2)*

¶ 13. As we noted earlier, at issue is the post-therapeutic relationship that developed between Bar-Av and Ms. B. The Board was concerned about how that relationship impacted both Mr. A and Ms. B. In finding that Bar-Av violated Wis. ADMIN. CODE § PSY

---

[6] Under Wis. ADMIN. CODE § PSY 1.02(3), the word "client" "includes the term and concept of 'patient.' "

5.01(2) (gross negligence),[7] the Board was troubled by Bar-Av's apparent failure as a psychologist to consider the possible consequences that his relationship with Ms. B would have on both Mr. A and Ms. B. Most troubling to the Board was that Bar-Av pursued this relationship despite his knowledge of the problems Mr. A was treated for, which Bar-Av should have known would be exacerbated by his relationship with Ms. B. The Board put it this way:

> What makes Mr. A's discovery about his former wife and Dr. Bar-Av all the more disturbing is the fact that Dr. Bar-Av, having extensively treated Mr. A over a period of several years, had to have known that his involvement with Ms. B would negatively impact Mr. A. It is inconceivable to imagine any other effect that such a discovery would have had. Indeed, Dr. Seaman agreed with that conclusion. According to Dr. Seaman's written report, the process of therapy broke down Mr. A's rigid and emotionally distant defenses, which were most likely related to his history of physical and sexual abuse by his older brother. Through the therapeutic process, the report notes, Mr. A became dependent upon Dr. Bar-Av. In turn, Mr. A viewed Dr. Bar-Av as being quite powerful and threatening. In light of that, especially Mr. A's insecurity about "competitors" for his wife and his history of sexual dysfunction, Dr. Seaman concluded that "it is difficult to imagine a boundary violation which would have been more destructive than for Dr. Bar-Av to become involved with Ms. [B]."

---

[7] WISCONSIN ADMIN. CODE § PSY 1.02(6) defines "Gross negligence in the practice of psychology" as

the performance of professional services that do not comply with an accepted standard of practice that has a significant relationship to the protection of the health, safety or welfare of patient or public, and that are performed in a manner indicating that the licensee knew or should have known, but acted with indifference to or disregard of, the accepted standard of practice.

¶ 14. The Board, referring to the expert report of Dr. Stephen F. Seaman, also pointed out that if Bar-Av was aware of the problems suffered by Mr. A and pursued a relationship with Ms. B regardless, "he was acting quite unprofessionally by disregarding the welfare of his former patient, Mr. A." The Board further stated that if Bar-Av was not aware of the possible impact his relationship with Ms. B would have on Mr. A, "it would demonstrate a lack of the most basic understanding of the therapy process so as to make him quite dangerous." Based on these observations, the Board concluded that Bar-Av committed gross negligence in the practice of psychology, in violation of WIS. ADMIN. CODE § PSY 5.01(2). In concluding that Bar-Av committed gross negligence the Board said:

> By engaging in a sexual relationship with Ms. B, after having treated not only her, but also Mr. A, her former husband, it is inconceivable that Dr. Bar-Av would not consider the possible consequences that such a relationship might have on Mr. A, not to mention on Ms. B. Moreover, the fact that he went ahead with the relationship anyway, in spite of all the problems that he knew Mr. A had, is unquestionably conduct that constitutes gross negligence.

¶ 15. The Board's construction of WIS. ADMIN. CODE § PSY 5.01(2) as applying to post-therapeutic conduct is reasonable under these facts. The impact of Bar-Av's post-therapeutic conduct on Mr. A was substantial. It is reasonable for the Board to conclude that a psychologist commits gross negligence within the meaning of WIS. ADMIN. CODE §§ PSY 1.02(6) and 5.01(2) when that psychologist is aware of a client's vulnerabilities but nonetheless engages in post-therapeutic conduct that demonstrates an indifference to or disregard of the potential impact that conduct

may have on the former client. The Board therefore reasonably concluded that Bar-Av should have known that his personal and sexual relationship would have a harmful impact upon Mr. A. By construing and applying § PSY 5.01(2) to Bar-Av's post-therapeutic conduct, the Board acted to protect the health, safety or welfare of his former clients. We are satisfied that the Board's interpretation of § PSY 5.01(2) was reasonable and consistent with the rule's purpose.

### 2. WISCONSIN ADMIN. CODE § PSY 5.01(4)

¶ 16. We next look at how the Board applied WIS. ADMIN. CODE § PSY 5.01(4), which provides that a licensee engages in unprofessional conduct when the licensee's "[p]erformance of professional services [is] inconsistent with training, education, or experience." Similarly to how the Board construed and applied § PSY 5.01(2), it observed that "[p]sychologists are trained and educated to maintain boundaries between themselves and their patients." In concluding that Bar-Av violated § PSY 5.01(4), the Board stated that "[b]y entering into a relationship with Ms. B, Dr. Bar-Av essentially disregarded any effect that such a relationship might have on Mr. A. In doing so, he clearly failed to adhere to the boundaries that are inherent in the education and training one receives as a psychologist."

¶ 17. We conclude the Board's interpretation of WIS. ADMIN. CODE § PSY 5.01(4) rule as applying to Bar-Av's post-therapeutic conduct is reasonable and consistent with the purpose of the rule. As the Board explained, psychologists are trained to maintain boundaries between themselves and their clients, and Bar-Av's behavior was inconsistent with his training and experience by exceeding those boundaries in entering

into a relationship with Ms. B. We also observe that by applying § PSY 5.01(4) to Bar-Av's post-therapeutic conduct, the Board properly signaled to other psychologists the importance of maintaining boundaries between the therapist and the former client, an objective consistent with the purpose of the rule.

¶ 18. On appeal, the Board discusses the transference phenomenon as an important reason for applying WIS. ADMIN. CODE § PSY 5.01(2) and (4) to post-therapeutic conduct. Seaman testified about transference. According to the Board, transference is a common feature of therapeutic relationships. *See also L.L. v. Medical Protective Co.*, 122 Wis. 2d 455, 461, 362 N.W.2d 174 (Ct. App. 1984). Transference "is the emotional reaction which the patient in therapy has toward the therapist. The patient in therapy 'unconsciously attributes to the psychiatrist or analyst those feelings which he may have repressed towards his own parents.' " *Id.* (citation omitted). "The patient 'develop[s] extreme emotional dependence on the therapist.' " *Id.* (citation omitted). The patient is healed by the resolution of these transferred feelings. *Id.* In order to benefit from therapy, the patient must trust the therapist. *Id.* Transference, however, involves more than the trust involved in other professionals "to whose procedures a patient submits or whose advice a client accepts . . . . [I]t "involves the emotional fragility for which treatment may have been sought, and permits the exploitation of the vulnerability that may be present during the course of treatment." *Steven G. v. Herget*, 178 Wis. 2d 674, 687, 505 N.W.2d 422 (Ct. App. 1993). The Board explains on appeal that

> [t]he development of this emotionally dependent trust relationship imposes a corresponding duty on the therapist to avoid any actions that betray the trust of a

patient. If a therapist betrays the fragile trust that is the foundation of the treatment relationship, the entire course of treatment may be ruined and rendered ineffective or even harmful.

¶ 19. The Board also explains that the transference phenomenon continues after the therapeutic relationship terminates. It therefore follows, according to the Board, that unprofessional conduct by a therapist after the therapeutic relationship has terminated "betrays the continuing trust of a patient i[n] mishandling . . . the transference phenomenon that could ruin the professional services provided during formal therapy and harm the patient." Thus, in the Board's view, such a betrayal constitutes unprofessional conduct in the performance of professional services.

¶ 20. Bar-Av counters that the Board's interpretation of its rules could result in disciplining a therapist for how a therapist treated a patient "decades earlier, even though the discipline was based upon some recent conduct found to be objectionable to the Board." But those are not the facts of this case. In any event, the burden rests with the Board to prove a violation of its rules. Under the Board's interpretation of its rules, the Board will be required to draw the requisite nexus between the treatment offered and the objectionable post-therapy conduct. Bar-Av's hypothetical does not persuade us that the Board's construction and application of the rules in this case will cause the future horrors Bar-Av complains of.

¶ 21. Bar-Av also argues that there is no legal authority supporting the Board's argument that the example of the transference phenomenon supports its construction of the rules. He asserts that the cases the

Board relies on, *L.L.* and *St. Paul Fire and Marine Ins. Co. v. Love*, 459 N.W.2d 698 (Minn. 1990), do not apply. The primary issue in both cases was whether there was coverage under insurance policies invoked after a therapist had sexual relations with a client. *See L.L.*, 122 Wis. 2d at 457; *St. Paul Fire*, 459 N.W.2d at 699. Bar-Av misunderstands the purpose for which the Board refers to these cases. The Board relied on these cases to explain what the transference phenomenon is and how transference supports its construction and application of its rules to post-therapeutic conduct. We see no problem with how the Board uses these cases in support of its construction of its rules.

### 3. WISCONSIN ADMIN. CODE § PSY 5.01(14)

¶ 22. Bar-Av next asserts that because WIS. ADMIN. CODE § PSY 5.01(14) contains language expressly addressing post-therapeutic conduct, this reinforces his view that § PSY 5.01(2) and (4) do not apply in the same manner. We disagree.

¶ 23. WISCONSIN ADMIN. CODE § PSY 5.01(14) addresses specific conduct, sexual contact with a client while therapy services are being provided and after those services have terminated. By their texts, § PSY 5.01(2) and (4) regulate a broader range of conduct. From the language of § PSY 5.01(14), it appears that the agency thought it important to more specifically regulate sexual activity between a psychologist and a client. This is likely because the applicable standard of care is such that a sexual relationship between a psychologist and a client, even after two years, is more the exception than the rule. *See* § PSY 5.01(14)(c). By proscribing sexual activity between a psychologist and a former client, the agency expressed a specific policy determination that this type of conduct exceeds the

scope of appropriate professional conduct. This fact, however, does not necessarily mean that the agency intended that its other rules apply only during an ongoing therapeutic relationship. By not providing language limiting the application of these two rules to behavior occurring only during the ongoing therapeutic relationship, it is reasonable to conclude that the agency intended these rules to apply to post-therapeutic conduct by psychologists as well.

### 4. WISCONSIN ADMIN. CODE § PSY 5.01(17)

¶ 24. Regarding WIS. ADMIN. CODE § PSY 5.01(17), Bar-Av argues that this rule applies only to dual relationships established during an ongoing therapeutic relationship. We agree with Bar-Av that this rule may be construed this way. However, we conclude that the Board's construction of the rule is not plainly erroneous or inconsistent with the language of the rule. We look to how the Board applied § PSY 5.01(17) to see how it has construed this rule.

¶ 25. WISCONSIN ADMIN. CODE § PSY 5.01(17) states that it is unprofessional conduct to fail to avoid dual relationships. In concluding that Bar-Av engaged in unprofessional conduct by developing a dual relationship with Ms. B, the Board focused on two areas of concern. First, the Board observed that the evidence does not demonstrate a clear line between the end of the therapeutic relationship and the development of the personal relationship between Bar-Av and Ms. B. The Board found that Bar-Av and Ms. B met for coffee within several weeks following the last therapy session, "to discuss her psychological needs, more specifically, what type of support group might be good for her." They also met occasionally "to discuss computer technology and issues related to the businesses Ms. B still owned

with Mr. A." The Board further found that from June 28, 1996 until September 16, 1996, Ms. B provided transportation for Bar-Av because he was unable to drive as a result of a seizure. It was during this time that Ms. B and Bar-Av began to develop their personal relationship, which, according to the Board's findings, still existed at the time the Board rendered its decision.

¶ 26. The Board was also concerned about what it perceived as conduct by Bar-Av demonstrating a greater concern for his needs than for his former client, Ms. B. The Board found "that between April of 1997 and March of 1999, [Ms. B] gave Dr. Bar-Av the following: $5000.00, a 1996 Volvo automobile for his use, and a computer and printer valued at approximately $3700.00." The Board also found that "[i]n September of 2000, Ms. B provided Dr. Bar-Av with $1980.00, in the form of a check." The Board pointed out that Bar-Av had repaid very "little, if any," of the money Ms. B gave him, including the $5000 she had obtained from her mother. Consequently, Ms. B was unable to repay her mother prior to her mother's death. It appeared to the Board that Ms. B "had obvious misgivings" about loaning that money to Bar-Av.

¶ 27. In concluding that Bar-Av engaged in unprofessional conduct within the meaning of Wis. Admin. Code § PSY 5.01(17), the Board made the following observation:

> The resulting rides, the purchase of an automobile, and the giving of money to Dr. Bar-Av were all a direct result of Dr. Bar-Av's needs, and not those of Ms. B's. As Dr. Seaman aptly summarized it, "This is typical of the development of their relationship, as an evolution of the therapy relationship into something more, with no clear boundaries, and the changes in the relationship often resulting from Dr. Bar-Av's needs, rather than

Ms. B's." Thus, Dr. Bar-Av very plainly failed to avoid a dual relationship that was obviously rife with the potential for financial, legal, and psychological conflicts.

¶ 28. We agree with Bar-Av that it may be counterintuitive to think that a psychologist may violate the rule regarding dual relationships by engaging in certain post-therapeutic relationship conduct. But the facts of this case provide a good scenario illustrating a reasonable application of this rule. The Board observed that it was difficult to ascertain where the therapeutic relationship between Bar-Av and Ms. B ended and where the personal relationship began. In other words, the boundaries between therapist and client in this case are not clear. Thus, it appeared to the Board that, at least during the period when Bar-Av and Ms. B began meeting socially and Ms. B provided transportation and money to Bar-Av, the therapeutic relationship was ongoing. What was clear to the Board was that Bar-Av directed Ms. B's attention to his needs, rather than maintaining professional distance so as to prevent any conflict of interest from occurring. We cannot say that the Board's interpretation and application of WIS. ADMIN. CODE § PSY 5.01(17) in this manner is plainly erroneous or inconsistent with the purpose of the rules of professional conduct.

¶ 29. In sum, we conclude, applying controlling weight deference, that the Board's interpretation of WIS. ADMIN. CODE § PSY 5.01(2), (4) and (17) is not plainly erroneous and is consistent with the purpose of the rules. We agree with the Board that there is no language in either § PSY 5.01(2) or (4) shielding a psychologist from discipline for conduct occurring after the termination of

408

the treatment relationship that adversely affects the services provided during the treatment relationship. We also agree with the Board that § PSY 5.01(17) may be interpreted as applying to post-therapeutic conduct when that conduct creates a financial, legal and psychological conflict of interest with a former client. We acknowledge that the language of these rules is not a paragon of clarity. However, we cannot say that the Board's interpretation of them is plainly erroneous.

## B. *The Board's Findings and Conclusions are Supported by Substantial Evidence*

¶ 30. Bar-Av appears to argue that the Board's findings and conclusions relating to Wis. Admin. Code § PSY 5.01(14) and (17) are not supported by substantial evidence.[8] More specifically, Bar-Av complains that there are no facts supporting the Board's conclusion that Bar-Av had a dual relationship with Ms. B or that she was exploited. He contends that the facts "clearly and unequivocally" demonstrate "a clear line of demarcation between the termination of therapy for Ms. B, and the emergence of a personal friendship between Dr. Bar-Av and Ms. B . . . ." In short, Bar-Av asserts that the Board's findings do not support its conclusion that he was involved in a dual relationship with Ms. B. He also asserts that there is no evidence supporting the Board's conclusion that Ms. B was exploited, or that she considered herself to be exploited. We disagree.

---

[8] Bar-Av also appears to continue his argument that the Board's construction and application of the rules of professional conduct governing psychologists is in conflict with the plain language of these rules. Because we rejected this argument in the previous section of this opinion, we do not address it here.

¶ 31. We will uphold an agency's findings of fact if supported by substantial evidence. WIS. STAT. § 227.57(6). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hacker v. DHSS*, 197 Wis. 2d 441, 467, 541 N.W.2d 766 (1995) (citations omitted). Where different conclusions may be drawn from the same substantial evidence, we defer to the choice of the agency as to which conclusion it accepts, so long as that choice is reasonable. *See Hamilton v. DILHR*, 94 Wis. 2d 611, 617–18, 288 N.W.2d 857 (1980).

¶ 32. We conclude that the record supports the Board's conclusion that Bar-Av violated WIS. ADMIN. CODE § PSY 5.01(17) by engaging in a dual relationship with Ms. B. We also conclude that there is substantial evidence that Ms. B was exploited, within the meaning of § PSY 5.01(14)(c).

¶ 33. As we have explained, the Board concluded that Bar-Av engaged in an impermissible dual relationship with Ms. B, in violation of WIS. ADMIN. CODE § PSY 5.01(17). A dual relationship is defined as "a situation in which a psychologist provides professional services to a person with whom the psychologist has another relationship such as, but not limited to, relatives, close friends, employees or employers, students or other supervisees." WIS. ADMIN. CODE § PSY 1.02(5m). The Board observed that "there was no clear ending of the therapeutic relationship and the independent development of a separate one." Applying the ALJ's analysis of the facts, the Board concluded that Bar-Av violated § PSY 5.01(17). The undisputed facts surrounding the

410

development of Bar-Av's personal relationship with Ms. B support the Board's conclusion.

¶ 34. According to the undisputed facts, Ms. B's last therapy session with Bar-Av occurred in December 1995. Thereafter, Bar-Av and Ms. B occasionally met over coffee to discuss various topics, including locating a divorce support group for Ms. B and computer technology topics. Then in approximately late June 1996, Bar-Av lost his driving privileges due to suffering a seizure. Ms. B transported Bar-Av in her car for approximately three months. During this time they developed a personal relationship, evolving into a sexual relationship in April 1998. In addition, Ms. B gave substantial sums of money to Bar-Av, as well as computer equipment, and bought Bar-Av a 1996 Volvo. These facts support the Board's findings, as well as the Board's conclusion that Bar-Av had engaged in unprofessional conduct in violation of Wis. Admin. Code § PSY 5.01(17)'s prohibition of dual relationships.

¶ 35. We also conclude that the record supports the Board's conclusion that Bar-Av exploited Ms. B in violation of Wis. Admin. Code § PSY 5.01(14). Most relevant to Bar-Av's case is § PSY 5.01(14)(c), which prohibits a psychologist from engaging in sexually related activity with a former client beyond two years of termination of professional services unless the psychologist can demonstrate there has been no exploitation of the former client in light of all relevant factors, including those enumerated in the rule. In other words, under § PSY 5.01(14), the general rule is that a psychologist is prohibited from having sex with a client or former client for two years. Thereafter, a psychologist may become sexually involved with a former client without violating the rule, but only if the psychologist

411

presents sufficient evidence when facing a charge of violating this rule that one or more exceptions to the general rule prohibiting sexual contact applies. WIS. ADMIN. CODE § PSY 5.01(14)(c).

¶ 36. The party alleging a rule violation has the burden of proving the violation; the party relying on an exception to a rule has the burden of proving the exception. *Ranes v. American Family Mut. Ins. Co.*, 212 Wis. 2d 626, 635, 569 N.W.2d 359 (Ct. App. 1997). Consequently, it was Bar-Av's burden under WIS. ADMIN. CODE § PSY 5.01(14)(c) to establish that his sexual relationship with Ms. B was free from exploitation. The Board met its initial burden of proving Bar-Av committed a prima facie violation of § PSY 5.01(14)(c) when Bar-Av conceded that he had a sexual relationship with Ms. B. The burden then shifted to Bar-Av to prove that one or more of the exceptions in § PSY 5.01(14)(c) applied. The Board reasonably concluded that he failed to do so.

¶ 37. The Board relied on various factors showing that Bar-Av failed to establish that Ms. B was not exploited. Keeping in mind that under WIS. ADMIN. CODE § PSY 5.01(14)(c) Bar-Av had the burden of producing evidence that Ms. B was not exploited, the Board first noted that Bar-Av failed to provide any facts that established a clear separation between the therapeutic relationship and the development of a separate and independent relationship. The Board also observed that Bar-Av failed to provide any evidence that he had considered the factors in § PSY 5.01(14)(c) before entering into a sexual relationship with Ms. B. More troubling for the Board was that, in spite of the fact that Bar-Av was aware of Mr. A's vulnerability, especially of his expressed fear that Bar-Av and Ms. B would develop such a personal relationship, Bar-Av became sexually involved with Ms. B. The Board explained:

Knowing Mr. A as he did, it is incomprehensible that Dr. Bar-Av even contemplated becoming involved with Ms. B, let alone, actually becoming involved with her. His conduct is clearly a violation of s. Psy 5.01(14), Wis. Admin. Code, particularly when one factors in his extensive therapeutic relationships with both Mr. A and Ms. B, the power balance that existed between him and Ms. B, and the overwhelming evidence that his needs were being met versus Ms. B's. What consistently emerges throughout the relationship between Dr. Bar-Av and Ms. B is that whenever Dr. Bar-Av needed something, be it transportation, a computer, or money, Ms. B was always at the ready to provide it to him. In taking this approach to his needs, Dr. Bar-Av either failed to consider its effects or simply disregarded them. Whichever the case may be, it demonstrates Dr. Bar-Av's indifference to his professional obligations as a psychologist.

¶ 38. Bar-Av insists that there is no evidence demonstrating that Ms. B felt exploited. His view of the record is that Ms. B willingly entered into a personal relationship with Bar-Av and that she trusted Bar-Av. The Board argues that Ms. B was likely experiencing transference when she and Bar-Av developed a personal relationship. In any event, the Board considered the evidence offered at the disciplinary hearing and, based on that evidence, determined that Bar-Av violated WIS. ADMIN. CODE § PSY 5.01(14). We conclude there was substantial evidence supporting the Board's reasonable conclusion that, under these facts, Bar-Av engaged in unprofessional conduct under this rule.

### C. Procedural Arguments

¶ 39. Bar-Av argues that substantial errors committed during the evidentiary hearing deprived him of his right to a fair hearing. In particular, he argues that the ALJ erroneously prohibited him from asking

Seaman certain questions on cross-examination; erroneously allowed Seaman to review materials before the hearing, including a psychological evaluation that was subject to an agreement limiting its admissibility; and erroneously allowed Seaman to testify despite what Bar-Av characterizes as a conflict of interest. We are not persuaded by any of these arguments.

¶ 40. Admission of evidence is a matter of agency discretion; we will uphold the discretionary decision if there is a reasonable basis for it. *See Board of Regents v. State Pers. Comm'n*, 2002 WI 79, ¶ 26, 254 Wis. 2d 148, 646 N.W.2d 759. "A proper exercise of discretion must be based on facts appearing in the record and on the appropriate and applicable law." *Id.*

*1. Cross-examination of Dr. Seaman*

¶ 41. We first address Bar-Av's argument that the ALJ violated Wis. Admin. Code § RL 2.15(3)[9] and Bar-Av's due process rights when she prohibited him from cross-examining Seaman regarding his experience performing forensic evaluations and the American Psychologist Association's standards for forensic evaluations. When Bar-Av attempted to question Seaman regarding the forensic evaluation standards, counsel for the DOE objected on the basis that no forensic evaluation was involved in the case and that Seaman's testimony was limited to offering an expert opinion on whether Bar-Av's conduct violated any of the rules of

[9] Wisconsin Admin. Code § RL 2.15 addresses the conduct of an administrative hearing and states in relevant part, "(3) EVIDENCE. The complainant and the respondent shall have the right to appear in person or by counsel, to call, examine, and cross-examine witnesses and to introduce evidence into the record."

professional conduct. The ALJ sustained the objection, agreeing that Seaman was never asked to conduct a forensic evaluation. The ALJ concluded that whether Seaman was qualified as a forensic psychologist was not at issue and sustained the objections on relevancy grounds. More specifically, the ALJ stated that the scope of Seaman's testimony was related to offering "an expert opinion as to whether or not [Bar-Av's] conduct as a psychologist was at or below the minimally competent standards for a psychologist."

¶ 42. Bar-Av argues that the ALJ denied him his right to cross-examine Seaman on the topic of "relevant professional standards for the work that the expert performed." He points to the fundamental rule that notions of fairness and due process support his right to cross-examine a witness. We agree with Bar-Av that the right to cross-examine a witness is fundamental in our legal system. However, Bar-Av fails to explain why Seaman's testimony on the topic of the American Psychological Association's standards for forensic evaluations was relevant to the topic of whether Bar-Av violated the rules of professional conduct. He does not dispute that Seaman was called to testify on the rules of professional conduct. Bar-Av also fails to explain how prohibiting him from cross-examining Seaman on the standards for forensic evaluations denied him his right to a fair hearing.

### 2. Admission of Psychological Examination Evidence

¶ 43. Bar-Av next argues that he was deprived a fair hearing when the Board violated a pre-hearing agreement, the terms of which limited the use of a psychological evaluation performed on Bar-Av by

415

Dr. John Gonsiorek. Counsel for the DOE gave Seaman a number of documents to review, including the report of that psychological evaluation, from which Seaman was asked to develop his expert opinion on whether Bar-Av violated the rules of professional conduct. The agreement provided that the DOE's counsel would not

> introduce as evidence at the hearing any information DOE receives from [Gonsiorek] as a result of this agreed upon evaluation for the purpose of proving that [Bar-Av] has engaged in the conduct alleged in the investigative file which would be a violation of a statute or rule which would subject [Bar-Av] to discipline.

The parties also agreed that the DOE's counsel may use any information obtained from the evaluation, among other purposes not applicable here, to determine the proper discipline if the Board found Bar-Av violated any of the rules. We conclude that the Board did not violate this agreement by making the report available to Seaman prior to the hearing to help him form his expert opinions regarding whether Bar-Av's conduct was below the minimum standards for a psychologist.

¶ 44. The agreement relating to the psychological evaluation prohibited the evaluation from being *introduced as evidence* as proof that Bar-Av violated the rules of professional conduct. Nothing in the agreement prohibits Seaman from considering Gonsiorek's evaluation in formulating an opinion whether or not Bar-Av's conduct was unprofessional. More significantly, Bar-Av fails to point to any information from the evaluation which was introduced as evidence at the disciplinary hearing. Seaman testified that he had read the evaluation, but that he did not recall anything in the evaluation that he had not learned from other sources.

Seaman also testified that he would have arrived at the same opinions he testified to without the evaluation. We are satisfied that the Board's counsel did not violate the terms of the agreement regarding the use of the psychological evaluation performed by Gonsiorek. It also does not appear that Bar-Av suffered any prejudice from the disclosure of the Gonsiorek report to Seaman.

### 3. Conflict of Interest

■■

¶ 45. Bar-Av argues that he was denied a fair hearing and that his due process rights were violated because Seaman, who once served on the Psychology Examining Board, was allowed to testify, despite what Bar-Av viewed as a conflict of interest. Bar-Av contends that Seaman was on the Psychology Examining Board when the Board decided to take disciplinary action against Bar-Av. Bar-Av argues that because Seaman had been a member of the Psychology Examining Board at the time this disciplinary action was commenced, Seaman should not have been allowed to testify as an expert witness. We disagree.

¶ 46. Bar-Av mischaracterizes the facts when he argues that Seaman was a member of the Board when this disciplinary action was instituted. Although Seaman had once been a member of the Board, he left the Board in February 2000, long before the complaint against Bar-Av was filed on March 24, 2003. Ultimately, the complaint charging Bar-Av with unprofessional conduct was not even filed by the Board, but was filed by a prosecutor employed by the DOE. In addition, although Seaman was on the Board when the case against Bar-Av was opened for investigation in September 1999, Seaman was not a member of the panel that

screened the complaint against Bar-Av to determine whether an investigation should be initiated.

¶ 47. Bar-Av also fails to point to any evidence that Seaman had access to details about open cases in general when he was on the Board, let alone Bar-Av's. Seaman testified that he had no knowledge of the facts of this case, and no familiarity with Bar-Av prior to this case other than general awareness of his name. In sum, nothing in the record suggests that Seaman had any involvement whatsoever in this case prior to his participation as an expert witness. Consequently, Seaman had no demonstrable conflict of interest that would have prevented him from testifying as an expert witness at the disciplinary hearing.

¶ 48. Bar-Av also argues his due process rights were violated because Seaman served on the Board. He relies on *Bracegirdle v. DRL*, 159 Wis. 2d 402, 413, 464 N.W.2d 111 (Ct. App. 1990), in support. In *Bracegirdle*, we reviewed a trial court's order reversing an order from the Board of Nursing, Department of Regulation and Licensing disciplining a nurse, Bracegirdle, for abusing a patient. *Id.* at 409–10. On appeal, Bracegirdle argued, in part, that the nursing board denied her right to an impartial decisionmaker because the chair of the nursing board acted both as an advisor who helped the prosecutor prepare charges against her and also participated in the board's deliberations and decision to reprimand Bracegirdle. *Id.* at 412–13. We rejected her argument, holding that even where a decisionmaker for the board served in a dual role as an advisor to the prosecutor, Bracegirdle failed to establish special facts and circumstances demonstrating an intolerably high risk of unfairness, rebutting the presumption of honesty and integrity of administrative adjudicators. *Id.* at 414–15.

¶ 49. Bar-Av's reliance on *Bracegirdle* is misplaced. Indeed, *Bracegirdle* cuts against Bar-Av. In *Bracegirdle*, we rejected a similar challenge to the impartiality of an administrative adjudicator who doubled as an advisor to the prosecutor. Here, Seaman was not even an adjudicator. The record shows that Seaman had no decision-making authority over Bar-Av's case whatsoever; therefore, the potential conflict presented here is even less apparent than in *Bracegirdle*. We conclude that Bar-Av has failed to establish special circumstances demonstrating an intolerably high risk of unfairness, *id.* at 414–15; therefore, the Board's decision to allow Seaman to testify was reasonable.

## CONCLUSION

¶ 50. Applying controlling weight deference, we conclude that the Board's interpretation of its own rules of professional conduct is reasonable and consistent with the purpose of the rules. We also conclude that the Board's findings of fact and conclusions of law are supported by substantial evidence. Finally, we conclude that Bar-Av was afforded a fair hearing and that his due process rights were not violated. We therefore affirm the circuit court's order affirming the Board's decision to revoke Bar-Av's license to practice psychology based upon findings of professional misconduct, in violation of WIS. ADMIN. CODE § PSY 5.01(2), (4), (14) and (17).

*By the Court.*—Order affirmed.